IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2008 JUL 29 P 3: 28

CLERK Button

DION JONES,                              )
                                         )
        Plaintiff,                       )
                                         )
    v.                                   )     CV 307-044
                                         )
FRED BURNETTE, Warden; BETTY             )
ALLEN, Telfair State Prison mail-room; and)
KIMBERLY GREGORY, Telfair State          )
Prison Mail-room,                        )
                                         )
        Defendants.                      )

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

Plaintiff brought the captioned case pursuant to 42 U.S.C. § 1983. The matter is now

before the Court on the motion for summary judgment filed by Defendants Fred Burnette

("Burnette"), Betty Allen ("Allen"), and Kimberly Gregory ("Gregory"). (Doc. no. 12).

Plaintiff has responded (doc. nos. 18, 19); Defendants have also filed a reply (doc. no. 17).[1]

For the following reasons, the Court **REPORTS** and **RECOMMENDS** that Defendants'

---

[1] The docket on this matter is somewhat confusing. Defendants' reply was filed before Plaintiff's response. (See doc. nos. 17, 18). In reviewing Plaintiff's first response, the Court notes that he has entitled it "Brief in Support of Plaintiff, Motion to Amend," and it appears that Plaintiff contends that he had submitted a response to Defendants' motion for summary judgment, that was never filed in the record. (Doc. no. 18, p. 1). As such Plaintiff submitted his "Brief in Support, of Plaintiff, Motion to Amend" which the Court has deemed as Plaintiff's amended response to Defendants' motion for summary judgment. The Court construes this "Brief in Support of Plaintiff, Motion to Amend," and Plaintiff's "Brief in Support of Plaintiff's Motion to Dismiss Summary Judgment," as his opposition to Defendants' motion for summary judgment.

motion for summary judgment be **GRANTED**, that this civil action be **CLOSED**, and that a final judgment be **ENTERED** in favor of Defendants.

## I. STATEMENT OF FACTS

Plaintiff is currently an inmate at Scott State Prison in Hardwick, Georgia, but at all times relevant to this litigation, he was incarcerated at Telfair State Prison ("TSP") in Helena, Georgia. Defendant Burnette is the Warden at TSP and has held that position since 2005. (Doc. no. 12, Defs.' Ex. 1, Burnette Aff. (hereinafter "Defs.' Ex. 1")). Defendant Allen is a mailroom clerk at TSP and has held that position since 2003. (Id., Defs.' Ex. 3, Allen Aff. (hereinafter "Defs.' Ex. 3")). Defendant Gregory is a mailroom officer at TSP and has held that position since 2004. (Id., Defs.' Ex. 2, Gregory Aff. (hereinafter "Defs.' Ex. 2")). Plaintiff alleges that Defendants violated his First Amendment rights because they denied Plaintiff access to three books he ordered from a publishing company. (Doc. no. 1, p. 5).

According to Plaintiff, he ordered the following three books that he authored from the Penhouse Publishing Company ("Penhouse"): (1) Mandingo Love, (2) Turned Out, and (3) Player, Cheater, or Damn Fool. (Id.). However when the books arrived at TSP, Defendants Gregory and Allen informed Plaintiff that, pursuant to Defendant Burnette's directions, Plaintiff could not receive the three books because they were contraband. (Id.). Plaintiff was then provided a property receipt for the books and given thirty (30) days to mail the books home, or, he was informed, the books would be destroyed. (Id.). Plaintiff then asserts that he met with Defendant Burnette on three occasions to discuss why Plaintiff was not allowed to receive his books. (Id.). Apparently, Plaintiff concluded that Defendant

Burnette did not have a valid reason for banning Plaintiff's books from TSP, and thus, Plaintiff initiated the above-captioned case.

Defendants agree that Plaintiff ordered three publications that he had authored from Penhouse: (1) Mandingo Love, (2) Turned Out, and (3) Player, Cheater or Damn Fool. (Doc. no. 12, Defs.' Ex. 1, ¶ 4; Ex. 2, ¶ 4; Ex. 3, ¶ 4). When these publications arrived at TSP Defendant Gregory examined the publications and suspected that they were contraband because of their pornographic sexually explicit writings and suspicious telephone call she had received from Plaintiff's wife or girlfriend regarding the publications. (Defs.' Ex. 2, ¶ 5). Accordingly, Defendant Gregory forwarded the publications to her superiors so that they could review them. (Id.). Defendant Gregory was not the decision-maker regarding whether the publications were contraband. (Id. at ¶¶ 3, 5). Defendants also contend that Defendant Allen never inspected the publications, nor was she involved in the decision-making regarding whether the publications were contraband. (Defs.' Ex. 3, ¶¶ 3, 5).

Defendant Burnette asserts that he is familiar with the allegation contained in Plaintiff's complaint. (Defs.' Ex. 1, ¶ 3). Defendant Burnette notes that both Plaintiff and his family sent letters to Defendant Burnette complaining about Plaintiff's failure to receive the three publications. (Id. ¶ 5). Defendant Burnette states that he conducted an investigation and met with Plaintiff on at least two occasions regarding the non-receipt of the publications. (Id. ¶ 6). Defendant Burnette learned from Plaintiff that Plaintiff's family owned and operated Penhouse and that Plaintiff was planning on selling the publications to other inmates. (Id.). As a result of the investigation, Defendant Burnette:

> determined that said publications were much more likely to contain

3

contraband given that the publisher was the Plaintiff's family. In this instance, where the "publisher" was comprised of members from the Plaintiff's family, the risk that the publication contained contraband or was altered is the same risk that would exist if the publication came from a family member directly, thereby jeopardizing the security of the institution. In addition to security concerns, said publications were prohibited because Plaintiff was planning to sell them to other inmates in violation of [Georgia Department of Corrections ("GDOC")] policy.

(Id. ¶ 7). Finally, Defendant Burnette noted that at the conclusion of his investigation, in order to prevent similar incidents from reoccurring, he instructed Defendants Allen and Gregory to send all publications addressed to Plaintiff to his office so that he could personally review them. (Id. ¶ 8).

The GDOC Standard Operating Procedure ("SOP") IIB04-0001 states that an inmate may receive books, magazines printed material, or photocopies only from the publisher, dealer, or established attorney of record. (Id. ¶ 9; Defs.' Ex. 7). According to Defendant Burnette, SOP IIB04-0001 was established for security reasons. (Defs.'Ex. 1, ¶ 9).

> The reason that the SOP requires books to come from a publisher is because it is less likely that books from a publisher will contain contraband or be altered from their original form. By limiting and regulating how inmates access these materials, the GDOC is able to prevent the introduction of contraband into Georgia's prisons. As a result, this policy significantly reduces the need for individual inspections; thereby saving taxpayers money without costing the inmates receiving publications any additional money. Such policy is necessary in order to prevent inmates from undermining the origin-based restriction by having their family members represent themselves as publishers.[2]

---

[2]Of note, even if a publication comes from a publisher, dealer, or attorney of record, SOP IIB04-0001 provides that any publication determined by the personal inspection of the Warden or his assistant to be a threat to the security, discipline, or good order of the institution can be excluded by the Warden. (Defs.'Ex. 4).

4

(Id.).

Defendant Burnette also notes that the GDOC policy prohibits inmates from conducting business in which one inmate directly sells goods to another. (Id. ¶ 11). SOPIIB02-0001 states that it is a violation for an inmate to be involved in "[e]xchanging, trading, bartering, giving, receiving or other participation in the transfer of money, personal property, or any other item of value from one inmate to another without the prior knowledge and permission fo a staff member." The rationale behind this policy is to avoid disputes that could threaten prison security arising from unauthorized business transactions between inmates. (Id.).

## II. DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Applicable substantive law identifies which facts are material in a given case.[3] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When seeking summary judgment, the movant must show, by reference to materials on file, that there are no genuine issues of material fact to be decided at a trial. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). If the burden of proof at trial rests

---

[3]The Court is mindful that for purposes of summary judgment, only disputes about material facts are important. That is, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

with the <u>movant</u>, to prevail at the summary judgment stage, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party." <u>United States v. Four Parcels of Real Property</u>, 941 F.2d 1428, 1438 (11th Cir. 1991) (*en banc*). On the other hand, if the <u>non-moving</u> party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial. <u>Clark</u>, 929 F.2d at 606-08 (explaining <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970) and <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986)). Merely stating that the non-moving party cannot meet its burden at trial is not sufficient. <u>Clark</u>, 929 F.2d at 608. Evidence presented by the movant is viewed in the light most favorable to the non-moving party. <u>Adickes</u>, 398 U.S. at 157.

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." <u>Clark</u>, 929 F.2d at 608. The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981). Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Anderson</u>, 477 U.S. at 255 (quoting <u>Adickes</u>, 398 U.S. at 158-59). A genuine issue of material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> at 248.

6

**B.     Merits of Plaintiff's Claim**

The core of Plaintiff's claim is that Defendants violated his First Amendments rights by not permitting him to receive the three publications he had ordered from Penhouse. Plaintiff asserts that because the publications came directly from the publisher, he should have been allowed to receive them and that the reason for the denial of the publications was not legitimate.[4]  (Doc. no. 18, pp. 1-2).  On the other hand, Defendants allege they are entitled to summary judgment and dismissal of Plaintiff's First Amendment claim because: (1) Plaintiff has failed to state a constitutional violation under the First Amendment; (2) to the extent that Plaintiff is seeking monetary damages, his recovery if any is limited to nominal damages; (3) because Defendants Allen and Gregory were not decision-makers, 42 U.S.C § 1983 does not allow them to be held liable under a theory of vicarious liability; (4) to the extent that Defendants are being sued in their official capacities, they are immune from monetary damages under the Eleventh Amendment; and (5) to the extent that Plaintiff is suing Defendants in their individual capacities, they are entitled to qualified immunity. (Doc. no. 12, pp. 1-2).

Defendants assert that Plaintiff was not allowed to receive the publications because they could be used to smuggle contraband[5] into the prison; furthermore, GDOC policy

---

[4]Plaintiff contends that Defendant Burnette expressed to Plaintiff that he could not have the books because the pages could be made of drugs. (Doc. no. 18, p. 2).  Plaintiff further alleges, "Once [the] formal grievance was filed [with] the Department of Corrections, Defendant changed his story and reason, as a book made of drugs sounded a little absurd." (Id.).

[5]Contraband may be defined as any item or article in possession of an inmate/probationer, or found within the facility/center, that has not been officially issued, purchased in the commissary, or approved by an appropriate staff member. SOP IIB04-0001.

prohibits inmates from conducting a business in which one inmate directly sells goods to another. (Defs.' Ex. 1, ¶ 11; Ex. 5). Thus, the Court must determine whether Defendants violated Plaintiff's First Amendment rights by refusing to allow Plaintiff to receive the Penhouse publications.

### 1. The Rational Basis For Rejecting Plaintiff's Publications

"It is well established that prisoners retain First Amendment rights. As the Supreme Court has emphasized, '[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution.'" Owen v. Willie, 117 F.3d 1235, 1237 (11th Cir. 1997) (quoting Thornburgh v. Abbott, 490 U.S. 401, 407 (1989)). However, a regulation affecting the First Amendment rights of prisoners to receive and possess "publications" are valid if the regulation is "reasonably related to legitimate penological interests." Owen, 117 F.3d at 1237 (quoting Thornburgh, 490 U.S. at 413). Thus, prison regulations impacting the First Amendment rights of prisoners are subjected to a type of rational basis test.

The analysis of the constitutionality of the regulation must be informed by the following factors: 1) whether the regulation is intended to further a "legitimate and neutral[6]" government objective; 2) whether the regulation is in fact rationally related to that objective; 3) whether the regulation requires prison officials to make "individualized" determinations with regard to prohibiting each "issue" or whether it simply makes "blanket" prohibitions of

---

[6]In this context, the regulation must be content-neutral in the sense that the "government interest [is] unrelated to the suppression of expression." Thornburgh, 490 U.S. at 415 (citation omitted). Thus, even if a regulation singles out a particular type of expression, the regulation is nevertheless regarded as "neutral" if its goal is not the suppression of protected speech. Id. at 415-16.

certain publications;[7] 4) whether, under the regulation, inmates retain "an alternative means of exercising the right;" 5) "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison;" and 6) whether the regulation is an "exaggerated response" to prison concerns, or, in other words, whether there exists an "obvious, easy alternative . . . that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests." Thornburgh, 490 U.S. at 414-19; Owen, 117 F.3d at 1237.

### 2. Constitutionality of the TSP Policy

The GDOC policy implemented at TSP does not violate the First Amendment. First, it is rationally related to a legitimate and neutral government objective. According to Defendants, the policy was implemented with the belief that books that come from a publisher are is less likely to contain contraband or be altered from their original form. (Defs.' Ex. 1, ¶ 9; Ex. 5). By limiting and regulating how inmates access these materials, the GDOC is able to prevent the introduction of contraband into Georgia's prisons. (Id., Ex. 1, ¶ 9). There can be no doubt that these goals reflect content-neutral and legitimate penological interests.

Of course, the regulation must also be rationally related to those goals. Defendants contend that the reason the SOP requires the publications to come directly from the publisher

---

[7] See Thornburgh, 490 U.S. at 416 ("We are comforted by the individualized nature of the determinations required by the regulation."). Moreover, the Eleventh Circuit has held that prison administrators are *required* to perform an individualized review before withholding the mailed publication: "[B]efore delivery of a publication may be refused, prison administrators must review the particular issue of the publication in question." Owen, 117 F.3d at 1237 (citations omitted). Moreover, the "blanket" prohibition of a publication "carries a heavy burden of unconstitutionality." Id. (citation omitted).

9

is because it is less likely that books from a publisher will contain contraband or be altered from their original form. As a result, this policy significantly reduces the need for individual inspections; thereby saving taxpayers money without costing the inmates receiving publications any additional money. (Id.). Such a policy is necessary to prevent inmates from undermining the origin-based restriction by having their family members represent themselves as publishers. (Id.). Here, because the "publisher" was comprised of members from Plaintiff's family, the risk that the publication contained contraband or was altered, is the same risk that would exist if the publication came from a family member directly. (Id. ¶ 7). As such, these publications coming from Plaintiff's family could jeopardize the security at TSP, thereby impacting both the guards and inmates in the prison.[8] (Id.).

Furthermore, SOP IIB04-0001 does not foreclose alternative avenues through which Plaintiff can exercise his First Amendment rights. GDOC policy permits the receipt of publications when they come directly from the publishers, dealers, or attorneys of record. Here, one of the reasons Plaintiff was not permitted to receive the publications was because Defendant Burnette learned from Plaintiff that the "publisher" was Plaintiff's family. To allow Plaintiff to receive these publications would have the effect of circumventing the GDOC policy that prohibits family members from sending publications directly to inmates.

---

[8]In addition Defendant Burnette also rejected the publications because he learned from Plaintiff that he (Plaintiff) intended to sell the publications to other inmates. (Id.). SOPIIB02-0001 states that it is a violation for an inmate to be involved in "[e]xchanging, trading, bartering, giving, receiving or other participation in the transfer of money personal property or any other item of value from one inmate to another without the prior knowledge and permission fo a staff member." The rationale behind this SOP is to avoid disputes that could threaten prison security arising from unauthorized business transactions between inmates. (Defs.' Ex. 1, ¶ 11).

Following this reasoning, allowing inmates to receive publications directly from their families would significantly increase the need for individual inspections.

The prison policy challenged here requires prison officials to make individualized determinations before confiscating or withholding any material. (Doc. no. 12, Defs.' Ex. 4). Of course, it is true that by allowing for individualized determinations, the policy affords prison officials with considerable discretion to confiscate or withhold publications. However, the Supreme Court has explained that in this context "broad discretion is appropriate." Thornburgh, 490 U.S. at 416. A standard which strips officials of such discretion would run the risk of sweeping too broadly or else excluding some publications needlessly. See id. at 417 ("We agree that it is rational for the Bureau [Federal Bureau of Prisons] to exclude materials that, although not necessarily 'likely' to lead to violence, are determined by the warden to create an intolerable risk of disorder.")

Finally, Plaintiff has not shown that the regulation is an "exaggerated response" or that "obvious, easy alternatives" exist which would not pose more than a *de minimis* cost to penological interests. Thornburgh, 490 U.S. at 418. The regulation is not a blanket ban on all publications; it simply limits the exclusion of those publications that do not come directly from the publisher, dealer, or established attorney of record, i.e., publications that come directly from family members. Put plainly, the policy is rationally related to important penological interests (prison security), and it does not run afoul of the First Amendment.

Furthermore, Plaintiff offers nothing to support any of his contentions that the policy has served as a pretext to harass him. In fact, Plaintiff's responses to Defendants' motion for summary judgment do not address SOP IIB04-0001 or SOP IIB02-001; Plaintiff merely lobs

11

multiple, unsupported[9] allegations about Defendant Burnette's actions/character as the Warden at TSP. (Doc. no. 18, pp. 1-4). Plaintiff does not address that the publications he ordered, although directly from the publisher, were in fact coming directly from his family. Instead, Plaintiff attempts to create an issue by attacking Defendant Burnette's character and stating that Defendant Burnette simply disallowed the publications because Plaintiff was the author. (Id.). These contentions are unsupported by the record. In sum, Plaintiff has failed to meet his burden to create a genuine dispute of material fact regarding his First Amendment claim. The policy at issue is constitutional, and Defendants are entitled to judgment as a matter of law.[10]

---

[9]The Court explained to Plaintiff:

> A response to a motion for summary judgment must be filed within twenty (20) days after service of the motion. Loc. R. 7.5, 56.1. A failure to respond shall indicate that there is no opposition to the motion. Loc. R. 7.5. Furthermore, each material fact set forth in a defendant's statement of material facts will be deemed admitted unless specifically controverted by an opposition statement. Should a defendant file a motion for summary judgment, Plaintiff is advised that he will have the burden of establishing the existence of a genuine issue as to any material fact in this case. That burden cannot be carried by reliance on the conclusory allegations contained within the complaint. Should a defendant's motion for summary judgment be supported by affidavit, Plaintiff must file counter-affidavits if he desires to contest the defendant's statement of the facts. Should Plaintiff fail to file opposing affidavits setting forth specific facts showing that there is a genuine issue for trial, the consequences are these: any factual assertions made in the defendant's affidavits will be accepted as true and summary judgment will be entered against Plaintiff pursuant to Fed. R. Civ. P. 56.

(Doc. no. 8, p. 6; doc. no. 13). However, Plaintiff merely submitted two responses to Defendants' motion for summary judgment that simply relied on his own self-serving, unsworn statements. (Doc. nos. 18, 19).

[10]Based on the analysis set forth above, the Court need not reach Defendants' arguments concerning Plaintiff's request for damages, vicarious liability, Eleventh

### III. CONCLUSION

For the foregoing reasons, the Court **REPORTS** and **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED**, that this civil action be **CLOSED**, and that a final judgment be **ENTERED** in favor of Defendants.

SO REPORTED and RECOMMENDED this 29 th day of July, 2008, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE

---

Amendment immunity, or qualified immunity.